# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEFENDERS OF WILDLIFE<br>1130 17th St NW<br>Washington, DC 20036, | ) ) ) ) | |
| Plaintiff, | ) | Civ. Action. No. |
| v. | ) ) ) | |
| DANIEL M. ASHE, Director<br>U.S. Fish and Wildlife Service<br>1849 C St NW<br>Washington, DC 20240, | ) ) ) ) ) | |
| SALLY JEWELL, Secretary<br>U.S. Department of the Interior<br>1849 C St NW<br>Washington, DC 20240, and | ) ) ) ) ) | |
| U.S. FISH AND WILDLIFE SERVICE<br>1849 C St NW<br>Washington, DC 20240, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.  In this case, Plaintiff Defenders of Wildlife, an organization dedicated to the conservation

of endangered wildlife, challenges decisions by the U.S. Department of the Interior and the

U.S. Fish and Wildlife Service ("Service") related to the protection of the northern long-

eared bat (*Myotis septentrionalis*) under the Endangered Species Act, 16 U.S.C. §§ 1531–

1544 ("ESA" or "Act"). Specifically, Plaintiff challenges the Service's final decision to list

the northern long-eared bat as "threatened" rather than "endangered" under the ESA, 80

Fed. Reg. 17, 974 (Apr. 2, 2015); the Service's "Significant Portion of Its Range" Policy,

79 Fed. Reg. 37,578 (July 1, 2014) ("SPR Policy"), which it applied in the listing decision; the Service's issuance of a special section 4(d) rule that fails to provide for the conservation of the species, 81 Fed. Reg. 1900 (Jan. 14, 2016); and the Service's issuance of, and reliance upon, a biological opinion for the 4(d) rule that is arbitrary and capricious.

2.   Prior to severe and rapid population declines caused by the fungal disease white-nose syndrome, the northern long-eared bat was most abundant in the eastern portion of its range (the northeast U.S. and Canada), common in the midwestern portion, less common in the southern and western portions of its range, and rare in the northwestern portion. 78 Fed. Reg. 61,046 at 61,065 (Oct. 2, 2013). Following the first detection of white-nose syndrome in the United States in 2006, which occurred in New York, the disease rapidly decimated northern long-eared bat populations throughout the northeast United States, once the "core" of the species' range, and continued to spread to the mid-western portion of the range, causing the Service to propose to list the species as "endangered" *throughout its range* in October of 2013, and expressly to reject the possibility that the species was merely "threatened" rather than "endangered." 78 Fed. Reg. 61,046. The Service's subsequent reversal of that position in the final rule violates the ESA, is arbitrary and capricious, and reflects outcome-oriented decision-making aimed at short-circuiting the ESA's automatic and mandatory statutory protections for "endangered" species.

3.   To reach its untenable conclusion that the northern long-eared bat is threatened rather than endangered, the Service applied an interpretation of "in danger of extinction" that constitutes a radical departure from the interpretation applied in the proposed rule and unreasonably requires a species to be at the point of functional extinction to warrant listing as endangered. Further, the Service relied on its facially unlawful SPR Policy to avoid any

consideration of whether the northern long-eared bat is endangered in a significant portion

of its range. Finally, the Service's reversal of position is not rationally connected to the best

available scientific data because the decision obscures and fails to address evidence

showing that white-nose syndrome is expected to bring northern long-eared bats close to

extirpation throughout the geographic areas where most of the remaining population exists

not within 8 – 13 years, but within just a few years.

4.  Having listed the northern long-eared bat as threatened rather than endangered to avoid the

mandatory and automatic statutory protections for endangered species, the Service

promulgated a rule pursuant to section 4(d) of the ESA to remove the default protections

provided to all threatened species by regulation. This 4(d) rule substitutes ineffectually

narrow and minimal protections for the robust protections that would otherwise be

provided by the default regulation. Despite recognizing the need to protect the species at

critical life stages, the 4(d) rule irrationally confers protections only within a small fraction

of the habitat upon which the species relies during those critical stages. The 4(d) rule fails

to meet the ESA's mandate to provide those measures "necessary and advisable" for the

conservation of the species and is arbitrary and capricious. The Service has also failed to

ensure that the 4(d) rule will not cause jeopardy to the species by diminishing the

likelihood of its survival or recovery.

5.  The biological opinion developed by the Service through intra-agency consultation to

evaluate whether the 4(d) rule will cause jeopardy to the northern long-eared bat's

continued existence relies on speculation and ignores available scientific evidence in

assessing impacts to the species from activities left unregulated by the 4(d) rule. The

biological opinion irrationally relies on inflated estimates of the species' population to

reach its conclusion that the rule will not jeopardize the northern long-eared bat. It fails to provide any meaningful analysis of the impacts of the rule on the *recovery* of the species, as opposed to mere continued survival.

6.    Plaintiff respectfully requests a remand of the decision to list the northern long-eared bat as threatened for further consideration of whether the species should be listed as endangered. Plaintiffs further seek vacatur of the 4(d) rule and reinstatement of the protections that are normally afforded threatened species per 50 C.F.R. § 17.31(a), as the 4(d) rule is unlawful under the ESA, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. Plaintiffs also ask that the biological opinion for the 4(d) rule, which also violates the ESA and APA, be set aside, and that the facially unlawful SPR Policy be vacated.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this lawsuit presents a federal question under the laws of the United States, including the ESA, 16 U.S.C. §§ 1531–1544, and the APA, 5 U.S.C. §§ 551, 706. This Court also has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) and 1540(g)(1)(C), 28 U.S.C. §§ 1331–1346, 28 U.S.C. §§ 2201–2202, and 5 U.S.C. § 702.

8.    This Court has authority to grant Plaintiffs' requested relief pursuant to 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 16 U.S.C. § 1540(g)(1) and 5 U.S.C. § 706. An actual controversy, within the meaning of the Declaratory Judgment Act, exists between Plaintiff and Defendants.

9.    Defendants' sovereign immunity is waived pursuant to the ESA, 16 U.S.C. § 1540(g)(1)(C) or the APA, 5 U.S.C. § 702.

10. As required by Section 11(g)(2)(C) of the ESA, 16 U.S.C. § 1540(g)(2)(C), Plaintiff
    provided Defendants with written notice of their violations of the ESA on March 3, 2016,
    via electronic mail and certified mail/return receipt requested.

11. Defendant Director of the Service Daniel Ashe received a copy of Plaintiff's notice letter
    by electronic mail on March 3, 2016, and by certified mail on March 7, 2016.

12. Defendant Secretary of the Interior Sally Jewell received a copy of Plaintiff's notice letter
    by electronic mail on March 3, 2016, and by certified mail on March 7, 2016.

13. More than 60 days have passed since notice was provided to Defendants, and the violations
    complained of in the notice letter are continuing or reasonably likely to continue to occur.

14. Venue is proper in the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28
    U.S.C. § 1391(e), as this civil action is brought against officers and employees of the
    United States acting in their official capacities and under the color of legal authority, a
    substantial part of the events giving rise to the claim occurred in the District of Columbia,
    no real property is involved in this action, and Plaintiff resides in this judicial district.

**PARTIES**

15. Plaintiff DEFENDERS OF WILDLIFE ("Defenders") is a non-profit, Internal Revenue
    Service Code Section 501(c)(3) organization headquartered in Washington, D.C. with
    offices in Arizona, Alaska, California, Colorado, Florida, Idaho, Montana, New Mexico,
    North Carolina, and Washington. Founded in 1947, Defenders is a science-based
    conservation organization with more than 1.2 million members and supporters nationwide.
    Defenders is dedicated to the protection of all native wild animals and plants in their
    natural communities and the preservation of the habitats on which they depend. Defenders
    advocates for new approaches to wildlife conservation that will help keep species from

becoming endangered, and employs education, litigation, research, legislation and advocacy to defend wildlife and their habitats. Defenders is one of the nation's leading advocates for endangered species and has been involved in issues of ESA implementation for decades.

16. Defenders brings this action on behalf of its members who derive scientific, aesthetic, recreational, and spiritual benefit from the northern long-eared bat. Defenders' members have observed the northern long-eared bat in the wild, have viewed bats in areas where surveys have confirmed the presence of the species, seek future opportunities to view bats in areas where surveys previously confirmed the presence of the species, and have ongoing interests in the northern long-eared bat. Defenders' members have concrete future plans to enjoy areas where the species has been detected and try to observe the northern long-eared bat in the wild. The interests of Defenders and its members in observing, studying, and otherwise enjoying the northern long-eared bat have been harmed by Defendants' actions and would be redressed by the relief sought in this case.

17. Unless the requested relief is granted, Plaintiff's interests will continue to be injured by the Defendants' failure to list the northern long-eared bat as endangered under the ESA, and by Defendants' promulgation of the 4(d) rule, which exempts a host of activities from the ESA's "take" prohibition, without providing for the conservation of the species. The Service's failure to provide the northern long-eared bat with the statutorily mandated protections to combat extinction contributes to the decline of the species, to a reduction in its numbers, and to a reduction in the ecological benefits provided by the species. The injuries described above are actual, concrete injuries that are caused by Defendants and presently suffered by Plaintiff and its members and will continue to occur unless relief is

granted by this Court. The relief sought herein, which includes an order that Defendants reconsider the listing of the northern long-eared bat and issue a new Final Rule within six months, and an order vacating the 4(d) rule, would redress Plaintiff's injuries. Plaintiff has no other adequate remedy at law.

18.   Defendant DANIEL M. ASHE is Director of the U.S. Fish and Wildlife Service, a federal agency within the Department of the Interior that is authorized and required by law to protect and manage the fish, wildlife and native plant resources of the United States, including enforcing and implementing the ESA, and to comply with all other federal laws that apply to the agency. The Service has primary authority for day-to-day administration of the ESA with respect to terrestrial species. Director Ashe is sued in his official capacity.

19.   Defendant SALLY JEWELL, United States Secretary of the Interior, is the highest-ranking official within the U.S. Department of the Interior, and in that capacity, has ultimate responsibility for the administration and implementation of the ESA with regard to terrestrial endangered and threatened species, and for compliance with all other federal laws applicable to the Department of the Interior. Secretary Jewell is sued in her official capacity.

20.   Defendant the U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality of the United States, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial species, including the northern long-eared bat. The U.S. Fish and Wildlife Service, headquartered in Washington, D.C., issued the listing and 4(d) rule decisions challenged herein, as well as the biological opinion for the 4(d) rule.

## STATUTORY AND REGULATORY BACKGROUND

### A.  The Endangered Species Act

21.  Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress passed the ESA to "provide a program for the conservation of . . . endangered species and threatened species," and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. §§ 1531(a)(1), (b).

22.  The ESA defines "conservation" as:

> the use of *all* methods and procedures which are necessary to bring any
> endangered species or threatened species to the point at which the
> measures provided pursuant to this chapter are no longer necessary.

16 U.S.C. § 1532(3) (emphasis added). Accordingly, the goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

23.   "Conservation" entails actions to ensure not just the survival but also the recovery of the species. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) (quoting *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 441–42 (5th Cir. 2001) ("'Conservation' is a much broader concept than mere survival. The ESA's definition of 'conservation' speaks to the recovery of a threatened or endangered species.")).

24.  Under ESA regulations, the Service has been delegated responsibility for administering the Act as it pertains to terrestrial species such as the northern long-eared bat. 50 C.F.R. § 402.01(b).

### 1. Section 4

25. To achieve the goal of conserving threatened and endangered species, Section 4 of the ESA requires the Service to determine whether a species should be listed as threatened or endangered, 16 U.S.C. § 1533(a)(1), designate critical habitat for the species listed as endangered or threatened, *id*. § 1533(a)(3), and promulgate and implement a recovery plan for species listed as endangered or threatened, *id*. § 1533(f).

26. A species is "endangered" if it is "in danger of extinction throughout all *or a significant portion of* its range." 16 U.S.C. § 1532(6) (emphasis added). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

27. The ESA automatically confers certain mandatory statutory protections on species that are listed as endangered, whereas protections for threatened species must be promulgated by the Service through regulation. For species listed as endangered, the ESA makes it "unlawful for any person . . . to "take any such species within the United States." 16 U.S.C. § 1538(a)(1)(B). The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). By regulation, the Service has defined "harm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. *See also Babbitt v. Sweet Home Ch. of Communities for a Great Oregon*, 515 U.S. 687 (1995) (upholding regulatory definition).

28. For species listed as threatened, the ESA provides that:

> [T]he Secretary *shall* issue such regulations as he deems necessary and
> advisable *to provide for the conservation* of such species. The Secretary
> may by regulation prohibit with respect to any threatened species any act
> prohibited under section 1538(a)(1) of this title, in the case of fish or
> wildlife, or section 1538(a)(2) of this title, in the case of plants, with
> respect to endangered species;

16 U.S.C. § 1533(d) (emphasis added).

29.   Pursuant to Section 4(d), the Service by regulation extended the prohibition on take to all

threatened species two years after the enactment of the ESA. *See* 50 C.F.R. § 17.31(a); 40

Fed. Reg. 44,412, 44,414 (Sept. 26, 1975). This blanket protection from take applies unless

the Service promulgates a "special rule" for the threatened species per Section 4(d). 50

C.F.R. § 17.31(c).

30.   In determining whether a species is threatened or endangered, the Service is directed to list

a species if it meets the definition of threatened or endangered based on the individual or

combined effect of five statutory factors: the present or threatened destruction,

modification, or curtailment of its habitat or range; overutilization for commercial,

recreational, scientific, or educational purposes; disease or predation; the inadequacy of

existing regulatory mechanisms; or other natural or manmade factors affecting its

continued existence. 16 U.S.C. §§ 1533(a)(1)(A)–(E).

31.   In making its listing determinations, the Service must use the "best scientific and

commercial data available . . . ." 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b). The

Service's regulations state: "The Secretary shall make [listing decisions] *solely* on the basis

of the best available scientific and commercial information regarding a species' status,

without reference to possible economic or other impacts of such determination." 50 C.F.R.

§ 424.11(b) (emphasis added).

32.  To ensure that decisions regarding the listing status of imperiled species are made expeditiously, the ESA sets deadlines for the Service's decision-making process. *See*, *e.g.*, 16 U.S.C. § 1533(b)(3)(deadlines for evaluating listing petitions and proposing action in response to listing petitions). One such deadline is that once the Service publishes a proposal to list a species, it must make a final decision on the proposal within one year; this deadline may be extended for an additional six months to solicit data, but only if the Secretary finds "that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned," *id*. § 1533(b)(6)(B)(i). *Id*. § 1533(b)(6)(A)(i).

33.  The ESA authorizes the Service to promulgate criteria or guidelines for use in making listing decisions, but requires that those guidelines must first be issued in proposed form for public comment. 16 U.S.C. § 1533(h).

34.  The Service, in concert with the National Marine Fisheries Service (collectively "the Services"), promulgated such a guideline to define the statutory language requiring the Services to determine whether a species is endangered or threatened "throughout all or significant portion of its range," 16 U.S.C. §§ 1532(6), (20). *See Final Policy on Interpretation of the Phrase "Significant Portion of Its Range" in the Endangered Species Act's Definitions of "Endangered Species" and "Threatened Species,"* 79 Fed. Reg. 37,578 (July 1, 2014) ("SPR Policy").

35.  The Services promulgated this guideline after a decade of litigation wherein courts rejected the Services' interpretations as unlawful. *See Defenders of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001); *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1218 (D.

Mont. 2010); *WildEarth Guardians v. Salazar*, No. CV–09–00574–PHX–FJM, 2010 WL 3895682, at *4-6 (D. Ariz. Sept. 30, 2010).

36. As described below, the interpretation in the SPR Policy is an unreasonable and unlawful interpretation of the statutory language because, inter alia, it directs the Service to forgo any analysis of whether a species is endangered in a significant portion of its range once the Service determines that the species is at least threatened throughout its range. Further, the Service failed to satisfy the procedural requirements of ESA section 4(h) by failing to provide notice and an opportunity for comment on this critically important aspect of the SPR Policy, which was not part of the draft policy published for public comment.

## 2.  Section 7

37. Under section 7(a)(2) of the ESA, federal agencies cannot undertake any action that is "likely to jeopardize the continued existence" of any listed species or cause "destruction or adverse modification" to any designated critical habitat for the species. 16 U.S.C. § 1536(a)(2). An "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," that are within the agencies' discretionary control. 50 C.F.R. §§ 402.02, 402.03.

38. To assist federal agencies in complying with their substantive duty to avoid jeopardizing listed species, section 7(a)(2) establishes an interagency consultation requirement. 16 U.S.C. § 1536(a)(2).

39.  To determine whether formal consultation is required, a federal agency proposing an action that "may affect" a listed species must prepare a document called a "biological assessment." *See* 16 U.S.C. §§ 1536(a)(2), (c); 50 C.F.R. §§ 402.02, 402.12, 402.14.

40.   If the proposed action is likely to adversely affect a listed species, the action agency and the Service must engage in formal consultation. 50 C.F.R. § 402.14. At the conclusion of the formal consultation process, the Service provides the action agency with a biological opinion as to whether the action is likely to jeopardize any listed species. *See* 16 U.S.C. § 1536(b)(3)(A), (4); 50 C.F.R. §§ 402.02, 402.14(g), (h). When the action agency is the Service itself, the Service conducts an intra-agency consultation that follows the same process.

41.   According to the Service's regulations, jeopardy results when it is reasonable to expect that the action would "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In evaluating whether an action will jeopardize the continued existence of a listed species, the biological opinion must evaluate whether the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of" the recovery of a listed species in the wild, even if it determines the action would not appreciably reduce the likelihood of survival. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931–32 (9th Cir. 2008) (interpreting 50 C.F.R § 402.02); *see also Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (Oct. 16, 2013) (because "[t]he goal of the ESA is not just to ensure survival, but to ensure that the species recovers to the point that it can be delisted," the Service must "consider whether the proposed action . . . could prevent the species from achieving . . . delisting.").

42.  If the action is likely to result in jeopardy to a listed species, the biological opinion must set forth the reasonable and prudent alternatives that would avoid this ESA violation. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(3).

43.  In fulfilling its obligations under Section 7(a)(2), "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

44.  Regardless of the conclusion reached by the Service in a biological opinion, the action agency has an independent duty to meet its substantive section 7 obligation to ensure that its actions do not jeopardize listed species. 16 U.S.C. § 1536(a)(2). An action agency violates its substantive section 7 duty if it relies on an inadequate, incomplete, or flawed biological opinion in carrying out an action.

### B.     The Administrative Procedure Act

45.  The APA confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity. 5 U.S.C. §§ 701–706.

46.  The ESA contains a citizen suit provision, but it does not specify any standard of review. For claims brought pursuant to the ESA's citizen suit provision, the APA governs the standard of review, but not the scope of review. The right of judicial review and waiver of sovereign immunity for these claims is found in the ESA citizen-suit provision, 16 U.S.C. §§ 1540(c) and (g). The ESA's citizen suit provision does not govern suits against the Service challenging its discretionary actions under the ESA, such as the issuance of biological opinions. *See Bennett v. Spear*, 520 U.S. 154, 156 (1997) (challenges to the Service's biological opinions are brought pursuant to APA). Accordingly, the APA governs

the scope and standard of review for Plaintiff's ESA claim concerning the Service's

biological opinion for the 4(d) rule.

47. Upon review of agency action under the APA, the court shall "hold unlawful and set aside

actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law." *Id*. § 706(2). An action is arbitrary and capricious "if the agency

has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### A.   The Northern Long-eared Bat and White-nose Syndrome

48. The northern long-eared bat (*Myotis septentrionalis*) is a medium-sized insectivorous bat

distinguished from other bat species, as its common name indicates, by its relatively long

ears. 80 Fed. Reg. at 17,975; 78 Fed. Reg. at 61,057 (describing diet).

49. The northern long-eared bat's geographic range extends through much of the eastern and

north-central United States, and all Canadian provinces west to the southern Yukon

Territory and eastern British Columbia. *Id*.

50. Northern long-eared bats depend upon the availability of suitable habitats for hibernation,

spring staging, migration, summer roosting, and fall swarming. During the winter, northern

long-eared bats hibernate in caves and other structures, collectively referred to as

"hibernacula." Northern long-eared bats and other species of bats commonly hibernate in

the same hibernacula. Northern long-eared bats move between hibernacula during the

winter. Northern long-eared bats may not return to the same hibernacula each year; however, the species is documented to return repeatedly to established hibernacula over the long term.

51. The purpose of hibernation is to conserve energy from increased thermoregulatory demands and reduced food sources. During hibernation, northern long-eared bats exhibit significant weight loss.

52. Between the end of winter hibernation and spring migration to summer habitat, northern long-eared bats gradually emerge from hibernation during a period called spring staging. During this period, the bats exit the hibernacula to feed, but return to the hibernacula daily to resume a state of torpor (sleep-like inactivity). Through this feeding, the bats increase their depleted fat stores to prepare for migration. This feeding is especially important for females, who must carry the weight of their unborn pups when migrating to the summer roosting areas.

53. Following spring staging, northern long-eared bats migrate to summer roosting areas. These summer roosting areas typically are 40 to 50 miles from the hibernation location. The bats rely primarily upon mature, interior forests to provide habitat during migrating, roosting, and feeding. In the summer, bats rely on trees and snags (dead or dying trees with shedding bark) to serve as maternity roosts where female bats give birth to and rear their pups. The pup season, when female northern long-eared bats give birth and nurture their young to the point where they are able to fly (volancy), varies in different portions of the geographic range, but generally occurs between mid-May and mid-August. Colonies are especially vulnerable during the period before the pups can fly because the pups cannot flee danger and must be carried by their mothers.

54. Northern long-eared bats switch roost trees during the summer and have been documented to do so as often as every three nights. The bats rely on an area of habitat within a 0.27 to 0.43 mile radius of their summer roosts for foraging for food.

55. In late summer, northern long-eared bats leave the summer roosting areas to return to the areas near hibernacula for the fall swarming, when most mating occurs. Swarming is a rendezvous of bats during which the bats fly around in a large, loose aerial mass, and mate whilst in flight. The female bats store the sperm, which impregnates them the subsequent spring when ovulation occurs near the end of hibernation. During fall swarming, northern long-eared bats are documented to use the area with a radius of up to 8.2 miles around their hibernacula for roosting and foraging. Occasionally, some copulation also occurs outside of the fall swarming period.

56. Access to food sources during the fall swarming is critically important to build up fat stores that have been depleted during migration so that the bats have sufficient fat to survive the winter hibernation.

57. Like other hibernating bat species, northern long-eared bats are susceptible to the deadly and rapidly spreading disease commonly referred to as white-nose syndrome.

58. White-nose syndrome ("WNS") is an infectious disease "responsible for unprecedented mortality of insectivorous bats in eastern North America." 80 Fed. Reg. at 17,993–94. The disease is caused by a psychrophilic (cold-loving) fungus known as *Geomyces destructans* or *Pseudogymnoascus destructans* (abbreviated "Pd"), which may be nonnative to North America, and appears to have arrived on the continent approximately a decade ago. 78 Fed. Reg. at 61,062; 80 Fed. Reg. at 17,995. The fungus grows on the muzzles, ears, or wing

membranes of hibernating bats, causing skin erosions filled with the filaments of fungal hyphae. *Id*.

59.    Bats infected with white-nose syndrome are characterized by excessive or unexplained mortality at or near the caves where they hibernate (hibernacula); unusual behavior such as daytime activity, premature depletion of fat-reserves necessary to survive through the hibernation period, and wing damage. 80 Fed. Reg. at 17,995.

60.    Although the exact process or processes through which the disease causes mortality remain unconfirmed, it is well-established that the fungal infection does indeed cause death. 80 Fed. Reg. at 17,995–96.

61.    Researchers have posited that irritation from the infection rouses the bats from torpor during hibernation, causing them to expend extra energy, thereby depleting fat reserves necessary for survival. 80 Fed. Reg. at 17,996.

62.    Researchers have also posited that wing damage from the infection may disrupt physiological processes by affecting thermoregulation, circulation, and respiratory gas exchange, causing dehydration and depletion of electrolytes. 80 Fed. Reg. at 17,996. Further, thirst caused by dehydration related to wing damage may result in additional arousals from hibernation, *id*., which, as described above, lead to depletion of winter energy reserves. Wing damage may also result in mortality by destroying the structures necessary for flight control. *Id*.

63.    Since its first detection in North America, which occurred in New York in 2006, WNS has spread rapidly throughout the northeastern, southeastern, and midwestern United States, as well as throughout eastern Canada. 80 Fed. Reg. at 17,994. As of February 2015, WNS was "confirmed present" in 25 states (Alabama, Arkansas, Connecticut, Delaware, Georgia,

Illinois, Indiana, Kentucky, Maine, Maryland, Massachusetts, Michigan, Missouri, New

Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina,

Tennessee, Vermont, Virginia, West Virginia, and Wisconsin) and five Canadian provinces

(New Brunswick, Nova Scotia, Ontario, Prince Edward Island, and Quebec). *Id.*

"Confirmed present" means that one or more bats in the state have been analyzed and

confirmed as having the disease. 78 Fed. Reg. at 17,994.

64. Based on consistent observations of the progression of the disease, "northern long-eared bat

declines are severe once WNS is confirmed at a site[.]" 80 Fed. Reg. at 18,011–12.

65. The data available at the time of the final listing decision showed that, for 103 sites in 11

U.S. states (New York, Pennsylvania, Vermont, West Virginia, Virginia, New Hampshire,

Maryland, Connecticut, Massachusetts, North Carolina, and New Jersey) and 1 Canadian

province (Quebec), the number of northern long-eared bats in winter colonies declined by

an average of 96% after the onset of white-nose syndrome. Sixty-eight percent of these

sites had *zero* northern long-eared bats based on cave surveys. 80 Fed. Reg. at 18,012.

66. For those U.S. states closest to the epicenter of the disease in Schoharie County, New York,

the population reductions as of the time of the final listing decision are even more

alarming. In Connecticut, where the species was formerly found in large numbers, and was

formerly present state-wide, *zero* northern long-eared bats were detected in the most recent

hibernacula surveys (2012 and 2013). 80 Fed. Reg. at 17,978. In Massachusetts, where the

species previously was found in relatively large numbers in some hibernacula, the most

recent surveys (2013 and 2014) found either zero or one northern long-eared bat in all

known hibernacula. *Id.* In New Hampshire, data from both hibernacula and summer

surveys showed a 99% decline in numbers of the species as of 2013. *Id.* Additional

hibernacula surveys from 2014 showed zero northern long-eared bats where the species previously was found in relatively high numbers. *Id*. In Maine, the most recent hibernacula surveys found only one northern long-eared bat total at sites that collectively had hundreds of northern long-eared bats prior to white-nose syndrome. *Id*. In Vermont, where northern long-eared bats were formerly one of the state's most common bats, the most recent hibernacula surveys (2013-2014) found zero northern long-eared bats. *Id*. In Pennsylvania, where the species was formerly abundant in hibernacula, winter surveys from 2014 showed a 99% decline in numbers compared to pre-WNS numbers. *Id*. In New York, where the species was formerly one of the most widely distributed in the state, most hibernacula surveys conducted between 2008 and 2013 found either one or zero northern long-eared bats. *Id*.

67. Prior to the onset of white-nose syndrome, the northern long-eared bat was most abundant in the eastern portion of its range (the northeast U.S. and Canada), and common in the midwestern portion. 78 Fed. Reg. at 61,052. The species was less common in the southern and western portions of its geographic range than in the northern portion, and rare in the northwestern portion. 78 Fed. Reg. at 61,065.

68. Approximately 40 percent of the northern long-eared bat's geographic range is estimated to be in Canada. The pre- and post-WNS population sizes for the species in Canada are unknown due to a lack of surveys either historically or currently, but purportedly numbered over a million prior to the 2010 arrival of white-nose syndrome in Canada. 78 Fed. Reg. at 61,054; 80 Fed. Reg. at 17,983. Despite the dearth of survey data, per an emergency assessment in 2014, Canada listed the northern long-eared bat as endangered due to white-nose syndrome under the Canadian Species at Risk Act. 80 Fed. Reg. at 18,019–20.

**B.    Proposed Rule to List the Northern Long-Eared Bat as Endangered**

69.   On January 21, 2010, the Center for Biological Diversity petitioned the Service to list the northern long-eared bat as endangered or threatened and to designate critical habitat for the species. *See* 78 Fed. Reg. at 61,047.

70.   On October 2, 2013, the Service proposed to list the northern long-eared bat as endangered *throughout its range*. 78 Fed. Reg. 61,046 (Oct. 2, 2013) ("Proposed Rule").

71.   In the Proposed Rule, the Service found that the impacts already observed in the portion of the range where the species was formerly the most abundant, in combination with the inevitable spread of the disease through the species' range, made the northern long-eared bat in danger of extinction. The Proposed Rule explained: "the northern long-eared bat is presently in danger of extinction throughout its entire range based on the *severity and immediacy* of threats currently affecting the species. The overall range has been significantly impacted because a large portion of populations in the eastern part of the range have been extirpated due to WNS. White-nose syndrome is currently or is expected in the near future to impact the remaining populations." *Id.* at 61,076 (emphasis added).

72.   First, the Service found that studied populations of northern long-eared bats, unlike other bat species affected by white-nose syndrome, did not stabilize following outbreaks of the disease. Whereas studied populations of other bat species eventually stabilized at low numbers, each of the fourteen studied northern long-eared bat populations in New York, Vermont, Connecticut, and Massachusetts "became locally extinct following exposure to WNS, and [studied] populations in Pennsylvania declined by 99 percent." *Id.* at 61,064.

73.   Second, the Service found that the portion of the northern long-eared bat's range where white-nose syndrome was already present encompassed the "core of the northern long-

eared bat's range, where the species was most common prior to WNS." *Id*. at 61,065. The

Service contrasted this "core" area (the eastern and midwestern portion of the range), with

the southern, western, and northwestern portions, where the disease had yet to spread. *Id*.

At the time of the proposed rule, white-nose syndrome was confirmed present in 22 of the

37 states within the northern long-eared bat's range. *Id*. at 61,064. The Service explained

that the species was considered to be "less common" in the southern and western portions

of the range where the disease had yet to spread, and was "rare" in the northwestern portion

of the range where the disease had yet to spread. *Id*. at 61,065.

74.     The Service specifically noted that although the midwestern and southern portions of the

range had not yet shown the same level of decline observed in the eastern portion of the

range, it "expect[ed] similar rates of decline once the disease arrives or becomes more

established" in those regions. *Id*. at 61,064.

75.     Nonetheless, based on the observed impacts to date, the Service concluded that "WNS has

already had a substantial effect on northern long-eared bats in the core of its range." *Id*. at

61,065.

76.     The Service noted that the "current rate of spread" empirically observed for the disease was

"rapid" because white-nose syndrome had spread from the location of "the first

documented occurrence in New York in February 2006, to 22 states and 5 Canadian

provinces by July 2013." *Id*. at 61,064.

77.     The Service noted that there was "some uncertainty as to the timeframe for when the

disease will spread throughout the species' range and when resulting mortalities as

witnessed in the currently affected area will occur in the rest of the range" because some of

the models for the future spread suggested a significant slow-down in some areas of the

United States. *Id.* at 61,064. However, the Service concluded that all models agreed that the disease "will indeed spread" throughout the United States. *Id.* at 61,064. Further, the Service explained that the possible slow-down shown by these models did not alter the analysis for northern long-eared bat because of the location of the species' geographic range within the United States, and the population distribution of the species within that range. The Service found that the potential for a significant slow-down of the spread of the disease in the Great Plains did not alter its analysis because the species was less common in the western edge of its range. *Id.* at 61,064. Similarly, the Service found that a potential temperature boundary to the spread of the disease at the far southern states, suggested by one of the models, did not alter the Service's analysis because the northern long-eared bat's range only slightly entered those southern states. *Id.* at 61,065.

78.   Based on these findings, the Service concluded: "The risk of extinction is high because the species is considered less common to rare in the areas not yet, but anticipated to soon be, affected by WNS, and significant rates of decline have been observed over the last 6 years in the core of the species' range, which is currently affected by WNS . . . We find that a threatened species status is not appropriate for the northern long-eared bat because the threat of WNS has significant effects where it has occurred and is expected to spread rangewide in a short timeframe." *Id.* at 61,076.

   **C.    The Service's Actions Between the Proposed and Final Rules**

79.   Although the Service published its proposed rule to list the northern long-eared bat in October 2013, it did not make its final decision until April 2015 due to multiple extensions and re-openings of the comment period. *See* 80 Fed. Reg. at 17,975.

80.    The proposed rule had a 60-day comment period, ending on December 2, 2013. On

December 2, 2013, the Service extended this comment period for thirty days, through

January 2, 2014. 78 Fed. Reg. 72,058.

81.    Rather than meet the ESA's one-year deadline for a final decision, the Service asserted that

a 6-month extension was needed to solicit additional data in light of purported

"uncertainty" and "disagreement" about "how and to what extent" white nose-syndrome

would spread and affect the species across its range. 79 Fed. Reg. 36,698 (June 30, 2014).

The Service again reopened the public comment period on the proposed rule for 60 days.

82.    On November 18, 2014, the Service reopened the comment period on the proposed listing

for the third time, for an additional 30 days, to take comment on information submitted to

the Service by state agencies. 79 Fed. Reg. 68,657 (Nov. 18, 2014). During that comment

period the Service received a request for a public hearing, which it held in Wyoming on

December 2, 2014.

83.    On January 16, 2015, the Service published a proposed rule to create a species-specific rule

under section 4(d) of the Act for the northern long-eared bat, if it were to be listed as a

threatened species, and reopened the public comment period on the proposed listing rule for

the fourth time, taking comments on both proposals for 60 days, ending March 17, 2015. 80

Fed. Reg. 2371.

84.    Just over two weeks after the close of that comment period, on April 2, 2015, the Service

published its final decision to list the northern long-eared bat as threatened rather than

endangered throughout its range. *See* 80 Fed. Reg. 17,974.

85.   At the same time, the Service finalized the proposed 4(d) rule for the species as an *interim* rule on the grounds that the delay caused by responding to public comment on the proposed 4(d) rule would harm the northern long-eared bat. *See id*. at 18,028–29.

86.   The interim 4(d) rule removed almost all protections for the northern long-eared bat that otherwise would have applied automatically under the "blanket" take protection for threatened species provided by 50 C.F.R. § 17.31.

87.   The Service published a final 4(d) rule on January 14, 2016. *See* 81 Fed. Reg. 1900.

**D.    The Service's Reversal of Position Regarding the Status of the Northern Long-eared Bat and Refusal to Consider Whether the Species is Endangered in a Significant Portion of Its Range**

**1.    The Service's Reversal of Position**

88.   Between July 2013 and February 2015, the fungus causing white-nose syndrome had spread to six additional U.S. states. *Compare* 78 Fed. Reg. at 61,064 (fungus present in 22 states and 5 Canadian provinces) *with* 80 Fed. Reg. at 17,996 (fungus present in 28 states and 5 Canadian provinces).

89.   At the time of both the proposed and final rules, the Service characterized the observed current rate of spread as "rapid." *Compare* 78 Fed. Reg. 61,064 ("The current rate of spread has been rapid, spreading from the first documented occurrence in New York in February 2006, to 22 states and 5 Canadian provinces by July 2013.") *with* 80 Fed. Reg. at 17,996 ("The observed spread of WNS in North America has been rapid, with the fungus that causes the disease (Pd) expanding over 1,000 miles (1,609 km) from the first documented evidence in New York in February 2006, to 28 States and 5 Canadian provinces by February 2015.").

90.   In both the proposed and final rules, in evaluating the imminence of the northern long-eared bat's extinction, the Service ultimately relied upon the observed rate of WNS spread as an indicator of the future rate of WNS spread, rather than on predictive models. *Compare* 78 Fed. Reg. at 61,064–65 (listing reasons why uncertainty as to timeframe suggested by results of various predictive models suggesting a slow-down of WNS spread at periphery of range did not alter conclusions based on observed spread to date) *with* 80 Fed. Reg. 17,997–98 ("As described, there are limitations and uncertainties with relying on these models to predict the rate at which the fungus will spread to currently unaffected areas. Thus, we instead relied on the observed rate of spread to date of Pd to develop a calculation of projected rate of spread through the remaining portion of the northern long-eared bat's range.").

91.   Neither the proposed nor final rules found evidence that the number of bats remaining in areas already decimated by white-nose syndrome was sufficient to prevent local extinction in those portions of the geographic range. In the final rule, the Service recognized that, even if some bats remained in areas already decimated by white-nose syndrome, the best available science indicated that the northern long-eared bat populations *had been reduced below the levels necessary to sustain the species* in those areas in the long term. 80 Fed. Reg. at 18,021 ("In the long term, based upon our best understanding of conservation biology, we believe the declines seen in this species may be unsustainable.").

92.   In the final rule, the Service asserted that it remained "unknown" whether the drastically reduced populations of bats remaining in those areas had stabilized at low numbers or were still declining. 80 Fed. Reg. at 18,021. Thus the Service acknowledged the absence of

evidence to support a conclusion that populations stabilized at low numbers after being infected by WNS.

93.  Further, in the final rule, the Service acknowledged the absence of a sufficient scientific basis to support a conclusion that any individual northern long-eared bats are capable of avoiding or surviving white-nose syndrome. 80 Fed. Reg. at 17,996 (noting absence of "direct evidence to suggest that some northern long-eared bats that encounter [the] *Pd* [fungus] do not contract WNS"); 18,012 (concluding there is "little, if any, data" to support assertion that individual northern long-eared bats have survived multiple years of infection).

94.  In both the proposed and final rules, the Service acknowledged that northern long-eared bat populations already had been drastically reduced throughout the "core" of the range, where the species was formerly most abundant. *Compare* 78 Fed. Reg. at 61,065 ("Given the observed dramatic population declines attributed to WNS . . .we are greatly concerned about this species' persistence where WNS has already spread. The area currently affected by WNS constitutes the core of the northern long-eared bat's range, where the species was most common prior to WNS[.]"), *with* 80 Fed. Reg. at 17,998 ("Information provided to the Service by a number of State agencies demonstrates that the area currently (as of 2015) affected by WNS likely constitutes the core of the species' range, where densities of northern long-eared bats were highest prior to WNS…The northern long-eared bat has been extirpated from hibernacula where WNS has been present for a significant number of years (e.g. 5 years), and has declined significantly in other hibernacula where WNS has been present for only a few years.").

95.  In both the proposed and final rules, the Service acknowledged that similar impacts would
be expected in the midwestern portion of the range, where the species was known to be
common, and where the fungus had already spread, within a few years. *Compare* 78 Fed.
Reg. at 61,064-65 ("We have not yet seen the same level of decline in the Midwestern and
southern parts of the species' range, although we expect similar rates of decline once the
disease arrives or becomes more established...we have no reason not to expect that where
it spreads, it will have the same impact..."), *with* 80 Fed. Reg. at 17,997 ("Early reports
from WNS-affected States in the Midwest reveal that similar rates of decline in northern
long-eared bats are already occurring or are fast-approaching.").

96.  In both the proposed and final rules, the Service recognized that there were also northern
long-eared bat populations in the southern, western, and northwestern portions of the range
that were presently unaffected by the disease and would not be affected until the fungus
spreads to those areas. In both the proposed and final rules, the Service acknowledged that,
prior to white-nose syndrome, the species was characterized as "less common" or "rare" in
those portions of the geographic range compared to the midwest and northeast. *Compare*
78 Fed. Reg. at 61,065 (citing scientific evidence showing "the species is less common in
the southern and western parts of its range and is considered to be rare in the northwestern
part of its range, the areas where WNS has not yet been detected.") (internal citation
omitted), *with* 80 Fed. Reg. at 17,998 (citing scientific evidence indicating "that the species
was considered less common or rare in the extreme southern, western, and northwestern
parts of its range, areas where WNS has not been detected.") (internal citation omitted).

97.  Furthermore, in the final rule the Service explicitly rejected the contention that evidence
that the species was more common in some southern states than previously thought should

alter its analysis of the status of the species. *See* 80 Fed. Reg. at 17,982–83, 18,008 (acknowledging that species may have been more common in Tennessee and Kentucky than previously thought, but finding there was insufficient evidence to draw conclusions about populations in the more southerly states where WNS has yet to spread).

98.  Thus, both the proposed and final rules recognized that populations in those more distant portions of the range where the species was less common or rare would remain stable until the fungus spread to those regions, in accordance with an expected future rate of spread that was based on the observed rate of past spread.

99.  Nonetheless, in its final decision, the Service decided to list the northern long-eared bat as threatened through its entire range rather than endangered throughout its entire range. *See* 80 Fed. Reg. at 17,974.

100.  The Service asserted that because there were "*potentially* millions" of northern long-eared bats in portions of the range yet to be decimated by white-nose syndrome, because the disease would not affect the most distant portions of the range, where the populations were still stable, for 8 to 13 years, and because "some bats persist" in geographic regions already devastated by the disease, the northern long-eared bat was not *presently* "on the brink of extinction" throughout its entire range and therefore not presently "in danger of extinction" throughout its entire range. 80 Fed. Reg. at 18,018, 18,022 (emphasis added). The Service further asserted that, in light of the anticipated continued spread of the disease, it was reasonable to conclude that the species would be "in danger of extinction" though out its entire range in the foreseeable future. *Id*. at 18,022.

101.  The Service has never promulgated a regulatory definition of "in danger of extinction." Rather, in a memorandum produced for litigation over the listing status of the polar bear

("Polar Bear Memo"), it set forth an interpretation of "in danger of extinction" to mean that

a species is "on the brink of extinction in the wild." *See* 80 Fed. Reg. at 18,020 (citing

December 22, 2011 Memorandum from Acting FWS Director Dan Ashe Re: Determination

of Threatened Status for Polar Bears as basis for interpretation applied in the final listing

decision for the northern long-eared bat).

102. The memorandum was not published for notice and comment rulemaking, and the Service

represented in the course of litigation that notice and comment was not necessary because

the agency would not use the Polar Bear Memo for making listing determinations for any

other species.

103. In this memorandum, the Service characterized its past status determinations as

representing four categories of circumstances where it has found species to be "on the brink

of extinction."

104. The final rule asserts that the northern long-eared bat "resides firmly in [the fourth]

category where no distinct determination exists to differentiate between endangered and

threatened. Therefore, our determination that this species is threatened is guided by the best

available data on the biology of this species, and the threat posed by white-nose

syndrome." 80 Fed. Reg. at 18,020.

### 2. The Service's Reliance on the Unlawful SPR Policy

105. In the final rule, the Service declined to reach a determination on whether the northern

long-eared bat was in danger of extinction in a significant portion of its range. *See* 80 Fed.

Reg. at 18,018, 18,022.

106. In refusing to make that determination, the Service relied upon its SPR Policy. *See* 80 Fed.

Reg. at 18,018, 18,022 (describing reliance on SPR Policy).

107.  Under the SPR Policy, the Services do not consider whether a species is endangered in a significant portion of its range once the species is determined to be threatened throughout its range. *See* 79 Fed. Reg. at 37,609.

108.  This aspect of the final SPR Policy was not part of the proposed SPR Policy that was presented for public comment. *See* 76 Fed. Reg. 76,987 (Dec. 9, 2011). Under the SPR Policy as proposed, the Service would first have determined the species' status throughout *all* of its range, and then, for species not endangered throughout all of the range, would have separately considered whether the species was endangered throughout a significant portion of its range. Even if the species were to be determined to be threatened throughout all of its range, the Service would have separately considered whether the species was endangered in a significant portion of its range. The Service dropped this proposal from the final rule and instead altered the definition of "significant" so that no portion of the range could be deemed "significant" for a species found to be at least threatened in all portions of its range.

109.  The Services asserted that this drastic change from the approach delineated in the proposed SPR Policy was prompted by concern that it would be "confusing" for a species to be listed as "threatened" based on its status throughout its entire range and simultaneously listed as "endangered" based on its status in a significant portion of its range. 79 Fed. Reg. at 37,579.

110.  In the proposed SPR Policy, the Service explained that there would be circumstances where "the best available scientific and commercial information may simultaneously support determinations that a species appears to have the status of 'endangered' in a significant portion of its range and also to have the status of 'threatened' throughout its

range" because "the determination that a portion of a species' range is significant is largely independent of the determination of the species' current status rangewide[.]" 76 Fed. Reg. at 76,996.

111. In the Final SPR Policy, the Services claimed that eliminating any consideration of whether a species was endangered in a significant portion of its range once it was deemed at least threatened throughout its range was in accord with congressional intent because "Congress intended that an analysis based on consideration of the entire range should receive primary focus, and thus that the agencies should do an SPR analysis as an alternative to a rangewide analysis only if necessary." 79 Fed. Reg. at 37,580. The Services purported to derive this congressional intent from the placement of the term "throughout all" ahead of the term "a significant portion" in the statutory definitions of "endangered" and "threatened." *Id.*

112. The Services failed to address how their decision could be reconciled with the congressional command to determine whether to list a species as "an endangered species or a threatened species" based on the listing factors, 16 U.S.C. §1533(a)(1). By the Service's same word-order logic, the determination of whether a species is an "endangered species" (in all or a significant portion of its range) must precede a determination of whether the species, if not endangered, may nonetheless be a "threatened species" (in all or a significant portion of its range).

113. The Final SPR Policy also fails to explain how short-circuiting any consideration of whether a species is endangered in a significant portion of its range once the species is deemed "threatened" throughout its range gives effect to the statutory language providing for a species to be listed as "endangered" if it is endangered in a significant portion of its range.

114.   The Final SPR Policy also fails to address the irrational result produced by the Policy,

which is that a species facing threats in a portion (but not all) of the range that are severe

enough to list the species as "endangered" because of its status in a significant portion of

the range will not be listed as "endangered" if there are *additional* threats to the remaining

portion of its range that make it threatened throughout that remaining portion of its range.

Thus, a species will be denied the mandatory protections for endangered species that it

would receive if it were *less* imperiled. The Services fail to explain how this result is

rational or comports with the ESA.

115.   Further, the Final SPR Policy makes the same legal error as the interpretation that the Ninth

Circuit rejected as unlawful in *Defenders of Wildlife v. Norton*, 258 F. 3d at 1141-42, by

defining "significant portion of its range" such that only a scenario consistent with

endangerment throughout the entire range will satisfy the definition. Precisely like that

unlawful interpretation, the Final SPR Policy therefore gives no effect to the statutory

language requiring a species to be listed as endangered if it is endangered in a significant

portion of its range. Under the Final SPR Policy, a species can only be listed as endangered

in a significant portion of its range where the individuals in a portion of the range (1) make

a "contribution to the viability of the species . . . so important that, without the members in

that portion, the species would be in danger of extinction, or likely to become so in the

foreseeable future, throughout all of its range," 79 Fed. Reg. at 37,578–79, and (2) also

meet the standard of being "endangered" in that portion by being "on the brink of

extinction" in that portion. This is indistinguishable from the interpretation rejected by the

Ninth Circuit in *Defenders of Wildlife v. Norton*, where the Ninth Circuit held that the

Service could not make the determination of whether a species is endangered in a

significant portion of the range turn on whether its status in a portion of the range causes the species to be endangered throughout the entire range. 258 F. 3d at 1141–42.

### 3. Consequences of Listing the Northern Long-Eared Bat as Threatened Rather than Endangered

116. The Service's reversal of position regarding the status of the northern long-eared bat was motivated by widespread opposition from private and state entities seeking to avoid the imposition of mandatory statutory protections against take that apply to species listed as endangered.

117. These mandatory protections for endangered species would protect individual northern long-eared bats from being taken either purposefully or incidentally. These protections would also prevent harm to the habitat upon which the species relies. The effect of these statutory protections would be to maximize the opportunities for the species to withstand the devastating effects of white-nose syndrome by reducing harm from other threats to healthy bats, and avoiding synergistic harm that results from other threats acting on bats that are already sick or weakened due to the disease. Indeed, even in the final listing rule, the Service acknowledged that "there is now likely a cumulative effect on the species" from habitat-destroying human activities in the portions of the range "that have been impacted by WNS." 80 Fed. Reg. at 17,993; *see also id*. at 18,006 (acknowledging that mortality from wind energy, prescribed burning, and habitat destruction may cumulatively with WNS adversely affect the species at the local population scale).

118. By listing the northern long-eared bat as threatened rather than endangered the Service avoided imposition of the mandatory protections from take that Congress intended would always apply to species in danger of extinction. Indeed, the sole purpose of the Service asserting that the species will not be in danger of extinction until white-nose syndrome has

caused the species to become functionally extinct throughout all but the fringe of its range was to avoid the mandatory statutory take protections for endangered species and to enable the Service to promulgate a special 4(d) rule.

119. As described below, upon concluding that the species was threatened rather than endangered, the Service immediately put in place an interim 4(d) rule to displace the default "blanket" take protection provided by regulation. The Service subsequently finalized an even weaker 4(d) rule. In promulgating the 4(d) rule, the Service has failed to satisfy its mandate to provide measures necessary and advisable for the conservation of the species.

E.     **The Service's Decision to Confer Irrationally Narrow Protections from Take on the Northern Long-eared Bat**

120. Under the blanket take prohibition of 50 C.F.R. § 17.31, "take" of threatened species, whether purposeful or incidental, is prohibited.

121. On January 14, 2016, the Service published its final 4(d) rule for the northern long-eared bat, which displaces operation of 50 C.F.R. § 17.31. *4(d) Rule for the Northern Long-Eared Bat*, 81 Fed. Reg. 1900 (Jan. 14, 2016).

122. The final 4(d) rule provided even less protection from incidental take than the interim 4(d) rule.

123. Under both the interim and the final 4(d) rule for northern long-eared bats, "incidental" take is subject to restrictions only in counties where WNS is present and within a 150-mile buffer area around those counties ("WNS Zone").

124. Whereas the interim 4(d) rule imposed blanket liability for incidental take within that zone and carved out certain exemptions from that liability, the final 4(d) imposes liability for take only in very limited circumstances.

125. The final rule prohibits purposeful take of northern long-eared bats subject to various exemptions, such as public safety, hazardous tree removal, and removal from human structures.

126. The final 4(d) rule regulates incidental take only under extremely narrow circumstances. No liability for incidental take applies outside the WNS Zone. Within the WNS Zone, liability for incidental take can only arise for activities occurring within 0.25 miles of "known" hibernacula, or for tree removal within 150 feet of a "known occupied" maternity roost tree between June 1 and July 31 of each year. *See* 81 Fed. Reg. at 1921. For tree removal activities only, the rule imposes liability for any take that occurs within 0.25 miles of the hibernacula. The rule imposes liability for other activities occurring within 0.25 miles of "known hibernacula" only if they cause take of bats inside the hibernacula itself.

127. By conferring protection only with respect to destruction of "known occupied" maternity roost trees and "known" hibernacula, the final 4(d) rule itself obviates any need to survey for these trees or hibernacula. Further, the rule creates a perverse incentive for landowners to destroy hibernacula and maternity roost trees to prevent them from becoming "known" through identification in state or federal databases.

128. The Service has acknowledged that the currently "known" hibernacula and maternity roost trees represent only a small fraction of the total hibernacula and maternity roosts trees for the species.

129. The Service has acknowledged that because so few hibernacula and maternity roost trees are "known," protecting only the "known" hibernacula and maternity roost trees confers an insignificant reduction in the harm to which the northern long-eared bat is exposed through habitat destruction.

130. The limited timeframe for the protections conferred by the 4(d) rule on "known occupied" maternity roost trees (June 1 through July 31) is explicitly based on ease of implementation rather than on a determination that the actual non-volant period for pups (i.e. the time before the pups can fly) in areas affected by WNS will be adequately covered by these dates. 81 Fed. Reg. at 1912 (despite study showing shift in lactation dates post-WNS, and background variation in non-volant period between different years and different geographic areas, making it earlier or later than the June 1 to July 31 timeframe, "a single timeframe for implementing the prohibition … provides clarity for the regulated public.").

131. The buffer distances of 0.25 miles from known hibernacula and 150 feet from known roost trees fail to ensure that bats emerging from hibernation, preparing for migration to summer roosts, and roosting will not be harmed by extensive tree clearing activities that remove foraging, roosting, staging, and swarming habitat from those areas.

132. The 4(d) rule provides no basis for concluding that these buffers protect a sufficient amount of habitat to ensure sufficient food and shelter availability for either healthy bats or bats weakened by white-nose syndrome.

133. The 4(d) rule acknowledges that "hibernacula *and surrounding forest habitats* play important roles in the life cycle of the northern long-eared bat *beyond the time when bats are overwintering*" because those areas are utilized during spring staging and fall swarming. 81 Fed. Reg. at 1905 (emphasis added). Yet the 4(d) rule provides no basis for the determination that protecting only the area within 0.25 miles from known hibernacula will adequately avoid harm to the species during spring staging or fall swarming.

134. The 4(d) rule acknowledges that the foraging habitat relied upon by the northern long-eared bats during the fall swarming encompasses the forest habitat within approximately 5 miles of the hibernaculum. 81 Fed. Reg. at 1910.

135. Further, the buffer distances fail to account for the increased vulnerability of bats affected by white-nose syndrome, whose fat stores are reduced by the effects of the disease, making them more susceptible to harm from reduction of adequate areas for foraging for food.

136. Instead of determining the minimum area surrounding hibernacula and roosting trees that is necessary to ensure that colonies will not be harmed by tree clearing activities *that actually do take place* within the staging, swarming, or roosting habitat, the 4(d) rule asserts that these tree clearing activities are unlikely to overlap with the habitat because only a small percentage of forests nationwide are cleared each year. 81 Fed. Reg. at 1910.

137. The 4(d) rule asserts that the likelihood of such overlap will decrease as the populations further decline in response to white-nose syndrome, making the extremely narrow protections appropriate. 81 Fed. Reg. at 1904 ("As populations decline . . . the chances of any particular activity affecting northern long-eared bats becomes more remote.").

138. The rule entirely fails to evaluate that, as those populations decline, the importance of protecting remaining bats increases, such that the harm to the species from extensive tree clearing activities *that actually do occur* within the foraging habitat will increase as the populations continue to decline.

139. Paradoxically, the 4(d) rule relies on the purported low probability of habitat destroying activities actually occurring within the species' habitat to assert that consequences to the species from this destruction are "inconsequential" while simultaneously asserting that the regulated public would be unduly burdened by regulations that would apply only when that

overlap actually occurs. 81 Fed. Reg. at 1904 (provision of only minimal protections "provide[s] flexibility so that the regulated public will seek to conserve the species").

140. Further, despite asserting that the provision of minimal protections is necessary to ensure that the regulated public will seek to conserve the species and to "building partnerships" for the species recovery, the rule fails to explain what incentive the regulated public has to voluntarily engage in such efforts. The 4(d) rule relieves that public even of the minimal responsibility to survey for the species prior to destroying habitat that may include "unknown" occupied hibernacula and "unknown" occupied roost trees by imposing no liability for death or harm that occurs with respect to such hibernacula or roosts. *See* 81 Fed. Reg. at 1904.

## F.   The Service's Biological Opinion on the 4(d) Rule

141. To fulfill its obligations as an action agency under ESA Section 7(a)(2) to ensure that its action of promulgating the 4(d) rule would not result in jeopardy to the northern long-eared bat, the Service engaged in an intra-Service consultation on the impacts of the rule. The Service, in its role as the consulting agency, finalized a biological opinion on the impacts of the 4(d) rule on January 5, 2016.

142. The biological opinion ("BiOp") concludes that the impacts to northern long-eared bats allowed under the final 4(d) rule will not jeopardize the continued existence of the northern long-eared bat through the next seven years. BiOp at iii, v, 1, 90–92.

143. The BiOp calculates the levels of lethal impacts to northern long-eared bats in maternity roost areas based on impacts to healthy bats, not bats already sick and weakened by white-nose syndrome, *see e.g.* BiOp at 38, despite the evidence that white-nose syndrome weakens bats and makes them more susceptible to death from circumstances that might

otherwise merely disturb healthy bats. *See, e.g*., BiOp at 17 ("individual NLEB sickened or struggling with infection by WNS may be less able to survive other stressors"); 80 Fed. Reg. at 17,991–92 (impacts to WNS colonies from forest conversion expected to include significant impacts, despite resilience prior to WNS, because "where WNS is present, there are additional energetic demands … WNS–affected bats have less fat reserves than non-WNS affected bats when they emerge from hibernation and have wing damage that makes migration and foraging more challenging" and females in particular must devote energy resources to healing that would otherwise be directed to survival and producing successful offspring.).

144.   The BiOp also fails to address the weakened state of WNS-affected bats in assessing the impacts of activities that remove foraging habitat, relying instead on the ability of healthy bats to adjust to such losses of habitat. *See* BiOp at 43, 51.

145.   The BiOp makes clear that its population estimates are not accurate due to substantial uncertainty in the underlying habitat occupancy estimates and therefore can only be used to evaluate the *proportion* of the northern long-eared bats that will be harmed by various activities. BiOp at 18 n.2 ("The occupancy data used in this analysis has many limitations and a substantial amount of uncertainty . . . our estimates of population are meant as [a] tool for assessing potential relative impact by providing a scale for comparison, not as a precise estimate of the northern long-eared bat populations.").

146.   Nonetheless, the BiOp then relies on those same population estimates to conclude that there will be a sufficient *total* number of maternity colonies now and through the next seven years that elimination of whole colonies as a result of loss of individuals will not cause jeopardy to the species' continued existence.  *See* BiOp at 67.

147. The population estimates inflate the northern long-eared bat population and inflate the number of colonies by assuming all forest is suitable habitat, relying on habitat occupancy estimates that are based on survey data with uncorrected biases, and assuming that, in presumptively occupied habitat, if the home range required for a colony is 1000 acres, every thousand acres will necessarily support a colony. *See* BiOp at 18–21.

148. The BiOp provides no reasoned explanation to support its cursory and conclusory assertion that the impacts allowed under the 4(d) rule will not cause jeopardy through its impacts on the recovery of the species (i.e. the attainment of the point at which the species is no longer threatened in even a significant portion of its range). *See* BiOp at 92. The BiOp acknowledges that at a local population scale, the activities allowed under the 4(d) rule may "exacerbate the effects of WNS . . . thereby accelerating declines and the likelihood of local extirpation," but does not reconcile this finding with the conclusory assertion that the activities will not diminish the likelihood of recovery. BiOp at 90. Acknowledging that elimination of WNS is the foremost conservation need for the species, the BiOp does not explain how accelerated loss of local populations is consistent with maintaining populations until such point in time that WNS is eliminated by development of a treatment or cure, and therefore will not undermine the recovery of the species. *See* BiOp at 90.

149. The BiOp's calculations of the level of lethal impacts to the northern long-eared bat population rely on unsupported assumptions and speculation, and fail to address evidence indicating the potential for a far larger impact.

150. The BiOp avoids analysis of whether extensive forest destruction that *actually occurs* within occupied habitat could jeopardize the species now or at any point in the next seven years by assuming that the proportion of occupied habitat deforested by the assessed

activities within a state will never exceed the average percentage of forest loss anticipated statewide. By using this approach, the BiOp avoids addressing whether large projects that actually do occur in occupied habitat could eliminate colonies that might be or become integral to the survival or recovery of the species as the number of surviving colonies dwindles over time.

151.  The BiOp applies this same defective approach to evaluate impacts from other threats.

152.  The BiOp's finding that the level of impacts resulting from the effects of drilling activities on "unknown" hibernacula will not jeopardize the northern long-eared bat is a conclusory assertion, unsupported by any facts or analysis. *See* BiOp at 63.

## CLAIMS FOR RELIEF

153.  For each of the Claims in this Complaint, Plaintiff incorporates by reference each and every factual allegation set forth in this Complaint as if set out in full below.

## FIRST CLAIM

**Defendants' Decision to List the Northern Long-eared Bat as Threatened Instead of Endangered Violates the Endangered Species Act and the Administrative Procedure Act**

154.  The ESA requires the Service to list a species as "endangered" if an analysis of the statutory factors listed under section 4(a)(1), made utilizing the best available scientific and commercial data, 16 U.S.C. § 1533(b)(1)(A), demonstrates that the species is "in danger of extinction throughout all or a significant portion of its range" and therefore meets the statutory definition of an endangered species, *id*. at § 1532(6). *Id*. at § 1533(a)(1). The ESA requires the Service to list a species as "threatened" if the analysis demonstrates that the species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range" and therefore meets the statutory definition of a threatened species, *id*. at § 1532(6). *Id*. at § 1533(a)(1).

155. This determination of whether the status of a species meets the definition of endangered or threatened, and therefore should be listed as such, must be made "solely on the basis of the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b).

156. In reversing its position, articulated in the proposed rule, that the status of the northern long-eared bat met the definition of "endangered" by virtue of being "in danger of extinction throughout all of its range," the Service applied an interpretation of "in danger of extinction" that requires a species to be functionally extinct (i.e. diminished past the point at which the species can sustain itself beyond the short-term) throughout most of its current range. This interpretation is unreasonable in light of the ESA's provisions to recover both endangered and threatened species to the point at which protection is no longer necessary. Further, this interpretation constitutes a radical departure from the interpretation of "in danger of extinction" that the Service applied in the proposed rule. In other words, between the proposed and final rules, the facts salient to the Service's decision did not meaningfully change due to new information; rather, it was the Service's legal interpretation of "in danger of extinction" that changed. The application of this extreme and unreasonable interpretation violates the ESA.

157. Where the northern long-eared bat has already been reduced below self-sustaining levels throughout the former core of its range by a pervasive, progressive, and certain source of harm, and where the portion of the range composing the bulk of the remaining population will meet the same fate within just "a few years" it was unreasonable for the Service to assert that the species is not presently "in danger of extinction" merely because some

populations in the most distant portions of the range will not be affected (and decimated) for 8 to 13 years. As the Service itself recognized at the time of the proposed rule, these circumstances represent the "brink of extinction."

158. Further, in relying on its plainly unlawful SPR Policy to conclude that it need not consider whether the northern long-eared bat is endangered in a significant portion of its range once having determined that the species is threatened throughout its range, the Service violated the ESA's express requirement to consider whether the species is endangered *either* throughout its range *or* in a significant portion of its range.

159.  The drastic reduction in northern long-eared bat populations throughout the former core of the species' biological range due to the past and on-going effects of white-nose syndrome constitutes an indisputably imminent danger of extinction in a large portion of the species geographic and biological range. The Service cannot escape proffering a rational analysis of whether the extreme impacts in this core portion of the range constitute endangerment in a significant portion of the range by unlawfully defining "significant" in a manner that deprives the statutory text of effect.

160. Finally, the Service's reversal of position regarding the status of the northern long-eared bat is not rationally connected to the best available scientific data, and is therefore arbitrary and capricious. The Service's explanation of its reversal of position obscures and fails to address the record scientific evidence demonstrating that white-nose syndrome is expected to bring northern long-eared bats close to extirpation with the next few years throughout the geographic areas where most of the remaining population exists.

161. The new facts and reasoning presented in the final rule do not rationally demonstrate that the threat of extinction for the northern long-eared bat is significantly less severe or

imminent than at the time of the proposed rule, when the Service concluded that the threats were so severe and imminent that it did not even propose to list the species as threatened.

162.  Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiff's members, and it likely that a favorable judicial decision will prevent or redress such injury.

**SECOND CLAIM**

**Defendants' SPR Policy's Interpretation of "Significant Portion of Its Range" Violates the ESA and APA**

163.  The Service must give independent effect to the statutory language requiring listing of a species that is endangered in a significant portion of its range, and therefore cannot interpret "significant portion of it range" in a manner that would make a species endangered in an "SPR" only where the species would also be endangered throughout its range. *Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1141–42 (9th Cir. 2001).

164.  The Service's SPR Policy, on which it relied in the final decision to list the northern long-eared bat as threatened, is plainly unlawful because it denies effect to the statutory language requiring independent consideration of whether a species is endangered in a significant portion of its range. The SPR Policy provides that the Service must ignore whether a species is endangered in a significant portion of its range once it determines that the species is threatened throughout its range, violating the statute's plain text mandate to consider whether a species is endangered in *either* all *or* a significant portion of its range. The Final SPR Policy therefore violates the ESA, 16 U.S.C. §§ 1532(6), 1532(20), 1533, and is arbitrary and capricious, and not in accordance with law per the APA, 5 U.S.C. § 706(2)(A), (D).

165. Further, the SPR Policy impermissibly creates a situation where a species cannot be listed as endangered unless it is endangered throughout its range.

166. Finally, the SPR Policy is procedurally deficient because a pivotal component of the Final SPR Policy was not presented in the proposed SPR Policy presented for public comment. Whereas the proposed SPR Policy required consideration of whether a species was endangered in a significant portion of its range even if the species was at least threatened throughout its range, the Final SPR Policy radically departed from this approach by foreclosing any SPR analysis once a species was determined to be at least threatened throughout all of its range. The failure to provide an opportunity for comment on this important aspect of the Final SPR Policy violates the requirements of ESA section 4(h), 16 U.S.C. § 1533(h), and the APA, 5 U.S.C. § 533, and acted without observance of the procedure required by law, 5 U.S.C. § 706(2)(D).

167. Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiff's members, and it likely that a favorable judicial decision will prevent or redress such injury.

**THIRD CLAIM**

**Defendants' Final 4(d) Rule for the Northern Long-eared Bat
Violates the ESA and the APA**

168. Because the 4(d) rule necessarily relies on arbitrary and capricious conclusions about the status of the northern long-eared bat  arrived at in the unlawful final listing rule, the 4(d) rule is inherently flawed and unlawful. Its conclusions about the conservation needs of the species are necessarily tainted by the unlawful analysis of the species' status.

169. Further, even if the Service could have lawfully listed the northern long-eared bat as threatened rather than endangered, the 4(d) rule fails to meet the requirements of ESA section 4(d) and is arbitrary and capricious.

170. For species listed as threatened, the ESA provides that "the Secretary *shall* issue such regulations as he deems necessary and advisable to *provide for the conservation* of such species." 16 U.S.C. § 1533(d) (emphasis added).

171. Section 4(d) imposes an ongoing mandatory duty on the Service to determine what protections are necessary and advisable for the conservation of the species, and to impose those protections by rule.

172. In issuing the final 4(d) rule for the northern long-eared bat, the Service violated its obligation to provide a rational explanation of its conclusions regarding the sufficiency of the final 4(d) rule to provide for the conservation of the species.

173. The Service's determination that the final 4(d) rule for the northern long-eared bat satisfies the requirements of ESA section 4(d) is arbitrary and capricious, and contrary to law. 5 U.S.C. § 706(2); 16 U.S.C. §§1533(d), 1532(3).

174. Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiff's members, and it likely that a favorable judicial decision will prevent or redress such injury.

## FOURTH CLAIM

### Defendants' Final Biological Opinion for the 4(d) Rule
### Violates the ESA and APA

175. The biological opinion is arbitrary and capricious because its analysis of impacts relies on unsupported assumptions and speculation rather than acknowledging that significant gaps

in the information required to evaluate jeopardy exist and giving the species the benefit of

the doubt. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2).

176.   On information and belief, the BiOp ignores available scientific evidence demonstrating

that the actual impacts to the species may be far greater than the BiOp calculates, and is

therefore arbitrary and capricious and fails to utilize the best available scientific data, as

required by the ESA. 16 U.S.C. § 1536(a)(2).

177.   The BiOp fails to provide any meaningful scientifically supported analysis of the impacts

of the 4(d) rule on the recovery of the species, apart from mere survival, in violation of the

requirements of the ESA and the regulations there under, 16 U.S.C. §1536(a)(2); 50 C.F.R.

§ 402.02, and is therefore arbitrary and capricious and not in accordance with law. 5 U.S.C.

§ 706(2)(A).

178.   The BiOp is arbitrary and capricious because it evaluates the impacts that are likely to

occur with respect to healthy bats, rather than bats that are sick and weakened as a result of

white-nose syndrome. 5 U.S.C. § 706(2)(A).

179.   The BiOp is arbitrary and capricious because it fails to provide any reasoned analysis or

support for its conclusions regarding impacts from drilling activities that affect "unknown"

hibernacula. 5 U.S.C. § 706(2)(A).

180.   The BiOp is arbitrary and capricious because it relies on population estimates that it

concedes are unreliable for anything but evaluating proportions of impact to conclude that

the absolute number of maternity colonies will be sufficient to ensure that no jeopardy

results from the loss of entire colonies. 5 U.S.C. § 706(2)(A).

181.   The BiOp is arbitrary and capricious because it avoids actually assessing whether large

projects that do in fact occur within occupied northern long-eared bat habitat could

eliminate colonies that have persisted despite white-nose syndrome, and therefore are vitally important to the survival or recovery of the species. 5 U.S.C. § 706(2)(A).

182. In issuing an arbitrary, capricious, and unsupported biological opinion in its capacity as consulting agency, the Service has therefore maladministered its ESA section 7 obligations in violation of the APA.

183. Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiff's members, and it likely that a favorable judicial decision will prevent or redress such injury.

## FIFTH CLAIM

**Defendants' Finalization of the 4(d) Rule Violates the Service's ESA Section 7 Duty to Ensure against Jeopardy Because the Service Relied on an Unlawful and Inadequate Biological Opinion**

184. Finalization of a 4(d) Rule requires the Service, in its role as an action agency, to comply with the mandate of ESA Section 7(a)(2) to conduct an intra-agency consultation to ensure that any action over which it has discretionary involvement or control is not likely to, inter alia, jeopardize the continued existence of any threatened or endangered species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.03, 402.14(a).

185. In relying upon an unlawful BiOp, the Service, as an action agency, has failed to satisfy its substantive obligation under ESA Section 7(a)(2) to ensure against jeopardy.

186. Defendants' violations of law pose actual and imminent harm to the protected interests of Plaintiff's members, and it likely that a favorable judicial decision will prevent or redress such injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that Defendants' April 2, 2015, decision to list the northern long-eared bat as threatened rather than endangered violates the APA and the ESA;

(2) Order Defendants to reconsider the listing of the northern long-eared bat and issue a new Final Rule within six months;

(3) Declare that the SPR Policy is an unreasonable interpretation of the ESA and violates the ESA;

(4) Vacate the SPR Policy;

(5) Declare that the January 14, 2016 final 4(d) rule violates the APA and ESA;

(6) Declare that the January 5, 2016 final biological opinion for the final 4(d) rule is contrary to the ESA and APA;

(7) Declare that Defendants' reliance on an unlawful and inadequate biological opinion in promulgating the final 4(d) rule violates the substantive duty to ensure against jeopardy under ESA Section 7;

(8) Vacate the final 4(d) rule;

(9) Set aside the biological opinion;

(10) Award Plaintiff its reasonable fees, costs, and expenses, including attorney fees, associated with this litigation pursuant to the attorney's fees provisions of the ESA, 16 U.S.C. § 1540(g) and the Equal Access to Justice Act, 28 U.S.C. § 2412, as applicable; and

(11) Grant Plaintiff such other relief as the Court deems just and proper.

Respectfully submitted this 12th day of May, 2016,


Jane P. Davenport (DC Bar No. 474585)
DEFENDERS OF WILDLIFE
1130 17th St NW
Washington, DC 20036
tel: (202) 772-3274
fax: (202) 682-1331
jdavenport@defenders.org

*Attorney for Plaintiff Defenders of Wildlife*